# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ERICK HERNANDEZ,

    Plaintiff,

v.                                      Case No: 6:16-cv-1807-Orl-28TBS

VINICIO HERNANDEZ and SAND LAKE
CANCER CENTER, P.A.,

    Defendants.

## ORDER

Erick Hernandez (Plaintiff) alleges that his former employers, Dr. Vinicio Hernandez (Dr. Hernandez) and Sand Lake Cancer Center, P.A. (Sand Lake) (collectively, Defendants), retaliated against him in violation of the False Claims Act (FCA), 31 U.S.C. § 3730(h), for reporting Defendants' fraudulent Medicare billing practices to federal authorities. Defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), (Doc. 19), and Plaintiff filed a response in opposition, (Doc. 21). The motion is due to be granted in part and denied without prejudice in part.

## I.    Background[1]

Dr. Hernandez is a hematologist and oncologist who founded Sand Lake in 2009. (Am. Compl., Doc. 15, ¶¶ 3, 19). Sand Lake is a full-service cancer treatment center providing radiation services to treat all types of cancer in Orlando, Florida. (Id. ¶ 3). Before opening Sand Lake, Plaintiff, who is a "MS Medical Physicist" with over 22 years of medical

---

[1] At the motion-to-dismiss stage, all well-pleaded facts in the Amended Complaint are accepted as true. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).

physics experience, (id. ¶ 7), performed consulting services for Dr. Hernandez as he started the process of opening Sand Lake, (id. ¶¶ 12–16). In October 2010, Plaintiff became Defendants' full-time employee as a medical physicist and supervisor of the radiation center. (Id. ¶¶ 13–21). Plaintiff's agreed upon annual salary was $225,000 along with an annual one-percent "radiation collection" bonus. (Id.). Plaintiff worked as a Sand Lake employee until he was terminated on June 10, 2016. (Id. ¶ 74).

In January 2016, Plaintiff discovered that Defendants were engaging in fraudulent Medicare billing practices.[2] (Id. ¶¶ 39–42). Specifically, Defendants were altering patients' medical records and submitting inflated Medicare bills to the federal government. (Id.). This fraudulent practice, which dated back to February 2015, resulted in overcharges of 15% on office visits where only a physician assistant—as opposed to a physician—saw the patient. (Id. ¶¶ 42, 45, 69). Plaintiff continued his investigations throughout the next several months. (Id. ¶ 69).

Also in January 2016—about the time Plaintiff discovered Defendants' fraudulent conduct—Defendants began conducting audio and video surveillance of several "common areas" within the facility. (Id. ¶¶ 36–38). Defendants never sought or obtained employees' consent to conduct the surveillance. (Id. ¶ 38). The recording equipment, although not placed in Plaintiff's office, was "strong enough" to capture any conversations occurring in Plaintiff's office. (Id. ¶ 38). Around the same time, Dr. Hernandez and the office administrator, Asha Jiawan, began "reviewing employee emails and desktops, in real time, spying on what [employees] were doing." (Id. ¶ 43).

---

[2] Around two years before, "[i]n March 2014, Sand Lake was raided by [f]ederal [a]gents in relation to alleged Medicare fraud." (Am. Compl. ¶ 26).

"[A]t least one Sand Lake employee confirmed seeing Jiawan looking at [Plaintiff's] desktop in real time, reviewing what he was doing—specifically around the time he discovered the Medicare billing fraud." (Id.). "Sand Lake and Dr. Hernandez knew about [Plaintiff's] . . . efforts to stop violations of the [FCA] because: (1) employees reported seeing that [Plaintiff's] computer was being monitored[] when he was reviewing the records related to the Medicare fraud; (2) Sand Lake and Dr. Hernandez were recording his audio conversations; (3) Sand Lake and Dr. Hernandez were viewing and intercepting [Plaintiff's] activities on his work computer[] when he was reviewing the records that related to the Medicare fraud; (4) representatives of Sand Lake, including Dr. Sollacio, were asked directly by Dr. Hernandez if [Plaintiff] was the False Claims Act whistleblower." (Id. ¶ 44).

After Plaintiff discovered Defendants' fraudulent billing practices, Defendants began to retaliate against Plaintiff. The following conduct occurred between February and June 2016: (1) Jiawan stated that Dr. Hernandez would not be paying Plaintiff's annual bonuses, (id. ¶ 46); (2) Dr. Hernandez declined to pay Plaintiff the full amount he was owed in unpaid bonuses, (id. ¶¶ 53, 62); (3) Defendants decreased Plaintiff's annual salary by $50,000, (id. ¶¶ 55–56); (4) Dr. Hernandez falsely claimed that Plaintiff agreed that he would not receive a bonus for 2014, (id. ¶ 63); (5) Dr. Hernandez began requiring Plaintiff to clock in and clock out, "treating him like a minimum wage-earning employee," and began harassing Plaintiff for failing to comply, (id. ¶¶ 63–64); (6) Sand Lake did not allow Plaintiff to use a "paid time off" day to take a vacation even though Plaintiff still had unused "paid time off" days available to him, (id. ¶¶ 66, 68); (7) Dr. Hernandez changed Plaintiff's employment from full time to working only two days per week, reducing Plaintiff's annual salary from $175,000 to $70,000, (id. ¶ 70); (8) Defendants repeatedly asked Plaintiff "if he had

resigned or was going to resign," (id. ¶ 73); and (9) Defendants terminated Plaintiff, providing no reason, (id. ¶ 74). Defendants failed to pay Plaintiff's annual bonuses for 2013, 2014, 2015, and 2016. (Id. ¶ 84).

In March 2016, Plaintiff contacted a federal investigator regarding Defendants' fraudulent practices, and he met with the investigator several times. (Id. ¶ 45). The Amended Complaint does not state whether the government ever took enforcement action based on Plaintiff's tips.

Plaintiff filed the instant lawsuit against Defendants on October 18, 2016, alleging four causes of action: retaliation under the FCA; breach of contract; failure to pay wages; and invasion of privacy. (Id. ¶¶ 75–93). On January 13, 2017, Defendants filed the instant motion to dismiss and Plaintiff filed a timely response in opposition.

## II.  Standard[3]

Generally, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). At the motion-to-dismiss stage, a court

---

[3] Portions of the Rule 12(b)(6) standard cited by Plaintiff are no longer current law. See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) (discussing the "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45–46 (1957), and concluding that "after puzzling the profession for 50 years, this famous observation has earned its retirement"). Thus, the Conley standard no longer applies.

4

must construe all plausible inferences derived from the facts of the complaint in favor of the plaintiff. Whitwam v. JetCard Plus, Inc., 34 F. Supp. 3d 1257, 1259 (S.D. Fla. 2014).

III. **Analysis**

Defendants argue in their motion to dismiss that (1) Plaintiff cannot hold Dr. Hernandez personally liable because he fails to pierce Sand Lake's corporate veil, (2) Plaintiff fails to sufficiently allege that Defendants were aware of Plaintiff's protected conduct before Defendants' retaliation, and (3) the Court should not exercise supplemental jurisdiction over the state law claims or alternatively, Plaintiff's state law claims fail under Rule 12(b)(6). Because the Court agrees that Plaintiff fails to state a claim of retaliation under the FCA and that the Court should not exercise supplemental jurisdiction over Plaintiff's remaining state law claims, the Court does not address whether Plaintiff's state law claims are sufficiently pled or whether the common law doctrine of piercing the corporate veil applies to the claims against Dr. Hernandez.

Plaintiff's sole federal claim is a claim for retaliation under the FCA. The FCA provides relief to any employee who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). Potential violations of the FCA include presenting a "false or fraudulent claim for payment or approval" and using "a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).

To state a retaliation claim under the FCA, the complaint must contain factual allegations that, if proven, would establish: (1) the plaintiff "was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA" (protected conduct),

5

(2) "the employer knew [the plaintiff] was engaged in protected conduct," and (3) "the employer was motivated to take an adverse employment action against the [plaintiff] because of the protected conduct." United States v. KForce Gov't Sols., Inc., No. 8:13-CV-1517-T-36TBM, 2014 WL 5823460, at *10 (M.D. Fla. Nov. 10, 2014).

Defendants contend that Plaintiff fails to sufficiently plead the second element of his retaliation claim—that Defendants were aware of Plaintiff's protected conduct. The Court agrees. Taken in the light most favorable to Plaintiff, Plaintiff's allegations fail to show that Dr. Hernandez or Sand Lake had knowledge of Plaintiff "acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA." There are several reasons for this conclusion.

First, Plaintiff's contention that Sand Lake personnel were recording or viewing Plaintiff's work activity—even while Plaintiff was viewing fraudulent medical records—does not, in itself, establish that Defendants had knowledge of Plaintiff's protected conduct. Plaintiff's job responsibilities at Sand Lake involved him in oversight of all radiation treatment services; in doing so, Plaintiff had "full access to patient billing information, including Medicare billings." (Am. Compl. ¶ 8). Thus, even if Jiawan monitored Plaintiff's computer in real time while he was viewing Defendants' medical records, Jiawan would have no way to distinguish whether Plaintiff was engaged in a protected activity or merely conducting ordinary business. See KForce Gov't Sols., 2014 WL 5823460, at *10; c.f. Mack v. Augusta–Richmond Cty., Ga., 148 F. App'x. 894, 897 (11th Cir. 2005) (citing Maturi v. McLaughlin Research Corp., 413 F.3d 166, 173 (1st Cir. 2005) ("Where an employee's job responsibilities involve overseeing government billings or payments, his burden of proving that his employer was on notice that he was engaged in protected conduct should

6

be heightened. Yet, such an employee can put his employer on notice by any action which . . . [, regardless of his job duties,] would put the employer on notice that [FCA] litigation is a reasonable possibility.") (internal citation and quotation marks omitted)). Plaintiff does not allege that he conducted obvious protected activities in his office—for example, speaking on the phone or typing a letter to the federal investigator—that, if heard or viewed by the surveilling Defendants, would place them on notice that Plaintiff was engaged in protected activities.

Second, Plaintiff alleges that during a meeting with Dr. Hernandez in February 2016, Plaintiff specifically did not "raise the Medicare fraud issues because he knew he would be terminated immediately, and [that he] wanted to report the fraud to the U.S. Government." (Am. Compl. ¶ 49). This shows that Plaintiff believed that Dr. Hernandez was unaware of his protected activity. Third, Plaintiff's contention that Dr. Hernandez asked another doctor whether Plaintiff was an "FCA whistleblower" demonstrates nothing more than Dr. Hernandez's *lack* of knowledge regarding whether Plaintiff was engaged in protected activities.[4] Fourth, any temporal proximity between the protected conduct and the alleged retaliatory actions is insufficient to overcome Defendants' lack of knowledge of the protected conduct. Cf. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th

---

[4] Plaintiff's timeline is inconsistent regarding Dr. Hernandez's alleged knowledge of Plaintiff's protected activity and his allegations of retaliation. Plaintiff alleges that he discovered Defendants' fraudulent practices in late January 2016, (Am. Compl. ¶ 39), but states that he began "act[ing] in furtherance of enforcement actions related to the [FCA] and the Medicare fraud he discovered by contacting the federal investigator . . . in *March 2016*," (id. ¶ 45 (emphasis added)). However, Plaintiff claims that Dr. Hernandez's statements during a *February 17, 2016* meeting between Plaintiff and Dr. Hernandez were "proof Dr. Hernandez and Sand Lake *knew* [Plaintiff] was acting in furtherance of helping federal officials uncover the Medicare fraud," (id. ¶ 48 (emphasis in original)). There are several other alleged acts Plaintiff describes as retaliatory that took place before Plaintiff's first protected activities occurred in March 2016. (See id. ¶¶ 47–57).

Cir. 2000) (explaining that, in the Title VII retaliation context, that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct"). For these reasons, Plaintiff's FCA claim fails to state a claim upon which relief can be granted.

There is no apparent independent basis for federal jurisdiction over Plaintiff's state law claims,[5] and the Court has discretion to decline to exercise jurisdiction over them. 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). In light of the early stage of these proceedings and the several remaining questions of state law, the "Court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts." Baggett v. First Nat'l. Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997). Therefore, Plaintiff's remaining claims will be dismissed without prejudice to refiling in state court.

IV. Conclusion

It is **ORDERED** that:

1. Defendants' Motion to Dismiss (Doc. 19) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** insofar as it sees dismissal of the FCA retaliation claim and that the Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The motion is otherwise **DENIED** without prejudice.

---

[5] The parties' citizenship is not diverse, (Am. Compl. ¶ 10), and although Plaintiff cites 28 U.S.C. § 1345 as a basis for federal jurisdiction, (id. ¶ 9), the United States is not a party in this litigation.

8

2. Plaintiff's retaliation claim under the False Claims Act is **DISMISSED WITH PREJUDICE**.

3. Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. Pursuant to 28 U.S.C. § 1367(d), the limitations period for Plaintiff's state law claims "shall be tolled while [they are] pending and for a period of 30 days after [they are] dismissed unless state law provides for a longer tolling period."

**DONE** and **ORDERED** in Orlando, Florida, on June 12, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties